Good morning, Your Honor. Stephen Rennick for the appellants. If I may, I'd like to reserve three minutes for rebuttal. Try to keep track of your time. I will, Your Honor. Thank you. I'd just like to briefly touch on the standard of review because the parties seem to be in some dispute over that, the issue being whether or not the standard here should be abuse of discretion. And that can quickly be resolved because Judge Wright did not have an opportunity to exercise discretion. Under the statute, the recognition of the foreign judgment was mandatory if the basic standards were met and could only be not recognized if one of the factors identified in California Code of Civil Procedure 1716, subsection B or C, was present. Judge Wright found that none of those factors were present and therefore, under the statute, he had no discretion to then not recognize. So we're not in an abuse of discretion situation. We're in our normal summary judgment standard of review, which is NOVA. You're basically saying that it's a legal question whether one of these was present and therefore, what he would have done had he found one of them present is not the issue. Exactly, Your Honor. It's not really that it's a summary. It's because it's a legal question. Yes, Your Honor. The question of how discretion would actually get exercised is an interesting one, but it isn't present here. So I agree. This is, in that sense, a legal question. And in the sense of whether it's a legal question, the question is, as the case law makes clear, recognition of a foreign judgment is looked at from the state law. The California state law, as both parties have indicated in their paperwork, is very well established. The Mulco case, the Wallersheim case, as to when issues of assessing liability against religious institutions, clergy, can be done. Yeah, but you're making a bunch of assumptions. I mean, let's assume for the moment that you're right in your assessment of that case law, that if this had all happened in the United States, this would have fallen outside of the cases that allowed the cause of action to go forward and, in fact, would have been viewed as an instance in which you can't judge the religious justification and, therefore, the cause of action wouldn't go forward. Let's assume that for now. I'd say it's maybe a close question, but let's leave it. Let's assume it. Then what? It didn't happen in the United States. That is, the woman who was in Japan, and she was either directly or indirectly, the record's a little unclear on that, spoken to in Japan. And so the assumption that you just take what would have happened if this was done on American soil by the American government or even in foreign soil by the American government is your problem, it seems to me. Well, I would say it's not a problem in the particular structure that we're dealing with. We're not talking about the Japanese judgment vis-a-vis Japan. What happened there, the standards under which this conduct was evaluated, is something that's strictly the issue of the Japanese courts, the Japanese country. But the plaintiff is not seeking to get validation of the findings. She's seeking to get money here. She's asking the courts of the United States to, in effect, order this defendant to pay a million dollars on the basis of this Japanese judgment. So it's a state action issue? In other words, there are various possible rubrics. You could say that order would be state action by a federal court and is therefore judged by the standards of the First Amendment. Yes. That's one possibility. Another possibility, that's not really a public policy defense. That's more than a public policy defense. That's essentially saying you just simply can't do it because this is state action in the United States. That's one theory. Yes. Another theory would be something softer with regard to the public policy defense, that somehow if we have to order the payment of the money, then it's against our public policy to do that even if the judgment itself has nothing to do with us. Correct. I believe that is the standard. I just gave you two different standards. You didn't tell me which one it was. Well, the reality is in our briefing we essentially argued both. There was an argument made that because of the constitutional level of this, that it was something that simply could not be done, that the courts cannot issue orders that the effect of which would be to violate First Amendment rights. The argument was also made that even if that... Well, wait a minute. But then there's the extraterritoriality problem. Would it violate First Amendment rights if the woman was in Japan and was done to her in Japan? There's some issue, but for the purpose of... Well, sure there's an issue because the First Amendment is not a Japanese law. So in Japan, Japanese nationals speaking or practicing religion or whatever they're doing are not subject to the First Amendment because they're in Japan and they're Japanese speaking in Japan. I agree, Your Honor. The issue here is not... We acknowledge the issue is not whether or not under Japanese law this judgment was appropriate. The question is whether or not it can be enforced in the United States consistent with the Constitution. Well, it seems to me that your better argument there, just speaking for myself, because of the extraterritoriality is really that it has to be repugnant to American public policy because otherwise you really are imposing indirectly an American constitutional standard on something that didn't happen here and as to which the First Amendment didn't apply to the activity in question directly. So it's all indirect. So to me, the cases suggest that the repugnant standard is pretty high. It's a big hurdle beyond saying, well, we probably wouldn't have issued this judgment here. So would you address how you see the repugnance standard? How high a bar is it and why this goes over the line? I think the case law is somewhat vague as to specific standards of how you judge repugnancy. There is, as my recollection, there's some comments in the drafter's commentary about this uniform statute that indicated it's a high standard. And I won't argue that it's not a high standard. There is case law making it clear that simple divergence from American law in and of itself is not sufficient. There really has to be something that goes to something more fundamental in public policy. Well, let's say this all happened in America, and we know that there are churches and other religious organizations that are run by con men, right? Well, you know that. Certainly. Yeah, sure. And so if someone who is motivated by a religion but is actually a con man takes money from another person, a woman, and cheats her out of it, are you saying that that person can't bring a suit against that minister, that church, to get the money back? Or if you get a preacher who... I've had cases like that, where they really con the congregation out of making huge donations as an investment and give them certain instruments that got really no substance to them without going into all the details. I mean, that minister is subject to our criminal laws, and we put him in jail. And so I don't know where there's this big conflict between... I mean, we protect religious beliefs, but we don't protect, say, conduct motivated by religion that's criminal. Your Honor, as focused on the point that's the key here, and when you get into the facts of the Japanese judgment, you see it, you repeatedly use the term con. That's the key that pretty much all of the cases that have allowed liability to be assessed against religious organizations ends up turning on. There is fraud, and fraud in a secular sense. It's not fraud in the sense of talking about divine retribution or hellfire and brimstone or things like that. There doesn't seem to be anything in the Japanese judgments, which is all we've got, that either says that the church didn't sincerely believe what it was saying, or that the preacher kept the money and bought herself a Cadillac. But this is a question, and it's a question that occurred to me with regard to the defamation cases as well. Of course there wasn't, because there was no reason in Japan to prove any of those things. They didn't matter. Just as in the English defamation cases, there's no reason to prove New York Times malice because it doesn't matter. That doesn't mean it didn't exist and couldn't have been proven. And so what do you do with that? I think the procedural situation really answers that. We're here on summary judgment. Those issues could, at least in theory, have been fleshed out through the normal processes of litigation. Are they relevant, though, to the enforcement of a foreign judgment? I would argue no, that you look at the judgment as it is and ask the basic question when that's compared to the relevant public policy of the state or of the nation. Is it repugnant? Even if there could have been a case that would have been proven, had the elements been in the foreign cause of action, that would have not been repugnant. We're at an interesting question. Yes, and something I mentioned earlier about how do you deal with the discretion issue. Maybe that really is when you do need a trial, when the issue becomes a little unclear. Yes, on its surface it seems to be repugnant. Is there more? Do we want to retry this case? We have a treaty with the Japanese government. I had vaguely heard that, and I actually went on the Department of State's website. It states the United States has no treaties with any country regarding recognition of judgment. On the other hand, I actually did have someone say to me there's a Japanese-American treaty. I have to take the State Department's website as probably being more accurate, but I honestly don't know. But it certainly wasn't an issue that was raised in the district court as being a basis on which this judgment would have to be enforced. Well, the Japanese trial court, if you read its decision, it appears to permit an inference, at least as I read it, that there was some undue influence, that there were some compulsive methods that were used. And I guess in view of that, I have, just speaking for myself, some difficulty seeing that there's a repugnancy to public policy. Well, I have two comments on that. First of all, we have to look at the Japanese court's analysis within the context of their law. But they made findings of fact as well. Yes. But what they called coercive starts from their legal analysis, which... Well, I take your point, but I guess I just have difficulty looking at the face of this and the... Well, the second point I was going to make is that if you look at particularly the Molko and the Wallersheim cases, and even another case that Plaintiff describes, the Bible Speaks case, in each of those cases, there was essentially a finding that the person was not voluntarily participating in these religious activities. In the Molko case, the Unification Church case, they were deceived as to what they were participating in. In the Wallersheim case, the Church of Scientology essentially, once the person became high enough, they started effectively threatening him if he didn't continue to engage in auditing, and threatening in a secular manner, not divine retribution, but that your businesses, your livelihood would be destroyed, the fair game issue. In the Bible Speaks case, there were fraudulent statements made to encourage the person to do these fraudulent, in a secular... I understand that, but they're different factually. But the court here says that this person was caused to suffer terror, they used that word, and anxiety, and that she was in a state of depression, and that these amounts were not given of her own free will. And I don't know how we can look behind that. When all the court is being asked is to enforce a foreign judgment. Because the policy that has been expressed in the relevant U.S. cases is that that sort of terror, fear, even coercion, if it takes place within a voluntary relationship, is acceptable. There's striking language in the Wallersham case. It is one of the functions of many religions to afflict the comfortable, to deliberately generate deep psychological discomfort. Many of these techniques are capable of inflicting emotional distress severe enough that it is foreseeable somewhat psychiatric problems will crack, or be driven into deep depression, but the Constitution values the good religion does for the many more than the psychological injury it may inflict on the few. And the Japanese judgment is clear that... I would say it's clear that any coercion that happened was within the religious context. It was part and parcel of this religion. It was an... I understand your position. Yeah, yeah. I have a couple of minutes left. No, you're minus two. Oh. I apologize. If the Court is satisfied, I will. I would like to have a brief opportunity to reply if the Court is. Thank you. Good morning, Your Honors. I'm Robert Cohen. I'm here for the appellee, Naoko Ono. You're obviously well aware of the facts. But just one thing to emphasize. What the Japanese Court did in applying Japanese law to the facts as they saw them, they made a determination that this church, the Saints of Glory Church, violated Japanese law. They made a determination that it was done in Japan. They made a determination that their judgment... The Japanese Court explicitly said, we are not judging anyone's religious beliefs because we're not allowed to do that. There's not even a... Not only is there not no major difference between what an American court would do and... Well, the assumption of the Japanese Court seemed to be that without regard to whether these were true or false beliefs, they were used to pressure her into giving up her money because she wasn't in a very good psychological frame of mind. And you're shaking your head. That's what I understood them to say. So in other words, they didn't judge the truth or falsehoods of beliefs, but they did seem to hold that talking somebody into giving up their money on the basis that they're going to go to hell if they don't is a viable cause of action. And it probably isn't just stated that way in the United States. Okay. The reason I was shaking my head was I thought you were trying to say that the Japanese Court didn't care whether or not it was making a judgment about someone's beliefs. The Japanese Court explicitly said we're not doing that. I understood they said they weren't doing that, but they said that assuming the... it's still a cause of action in Japan that they pressured this woman into giving up her money by tactics that they didn't care for in terms of... And I do not think that that would be true in the United States, starting with the original supple case in California. It's true in California. Right. So, go ahead. I'm sorry. Go ahead. I think I can differ with you. I think an American court would come to the same conclusion. There's two points we made. One, I don't think it matters at all because we have to decide whether it's repugnant or not, and I think that decides the whole issue. But even if we did consider that issue, the point that I want to make is that an American court would come to the same conclusion because what the Japanese court did, it described lots of facts. Of course, it described beliefs, but it didn't make any judgment about those beliefs. It explicitly made judgment about conduct. And the conduct it condemned was not, well, we don't believe those teachings are about people going to hell or not. That had nothing to do with their decision. What I'm saying is the truth or falsity is not the end of the story. Right. They did make judgments about the fact that they talked to her for five hours on end and told her that she was going to go to hell and that she was in a bad psychological state and they overrode her will. And that would not fly in the United States with regard to something that was based on religion. They made a specific finding. Let's take religion out of the picture for a second. But religion can't go out of the picture because unless you take religion out of the picture, the problem is gone. I don't think that's true because the Japanese court made a finding that this group of people, whether they were religious or not, overcame Naoko Ono's free will. They made a specific finding that this group of people, in violation of Japanese law, without respect to whether they're a church or not. So let's say you have a revival in a southern town which goes on for two days and people are told that there's hell in Brimstone and they're talking in tongues and at the end of it they say you should each give us 50% of your money. There's no way that's a viable cause of action in the United States. But here it wasn't a sum of money. This was all of her money. This was 100% of her money. It wasn't 10% of her money. And it wasn't based upon only the threat that you might go to hell with fire in Brimstone. I think you're better off if you move where you were going, which is the repugnancy issue and state action and so on. I fully agree. And extraterritoriality and lots of other problems. Lots of other problems. But just dealing with this one alone, I've made my point that I think that it's focused upon conduct. But the larger point, regardless of whether it is focused on conduct or not, is that in order for an American court, based upon California law, or any state in the Union for that matter, in order for them to be able to disregard the Japanese judgment in light of the statute, is that it has to find that what the Japanese court did was so offensive to traditional notions of justice and what is decent that it amounts to an assault on decency that no American could stand for. That it was that outrageous. That's what the cases say you have to find. Do you think that this would not be a viable cause of action in the United States for deeply held reasons granted in the First Amendment irrelevant to that consideration? It might be a relevant factor. You might say, look, if you're going to look at a foreign judgment and the question is, well, does this deeply offend our traditional notions of what is just and decent? Among the things that you would look for, among the factors that you would look at in trying to answer that question might be, well, what are our constitutional norms? What are our traditions? That would certainly go into the assessment, but that would be overpowered by the commonsensical rule that what the Japanese court did here is they saw a church take advantage of a woman who had the depression that they talked about, who had the physical ailment, the ataxia, who was isolated from her family, and they took all of her money over the course of two months. That hardly, whether or not... Let me ask conceptually. Okay. There aren't too many cases that are anywhere directly in this realm, and they seem to be the English defamation enforcement cases and the Yahoo case in a very indirect way. On your theories, are the English defamation cases right or wrong, i.e., should those have been enforced or not? On my theory, those cases are right, but because of a specific reason that doesn't apply here in the statute itself. In, what is it, Code Section 1716, one of the subsections says it specifically deals with defamation claims. So it says... There's a separate statutory reason. Exactly, that's what I'm trying to say. There's a separate statutory reason in the statute itself that says, look, if there's a defamation claim and this foreign government doesn't give due deference to the First Amendment in the way that we do, then there's a different analysis. But that's not... The fact that there's a special statute for that situation only underscores the fact that we don't have that analysis here. What we have here is whether or not it is truly repugnant to traditional notions of what is fair and just. And nobody could say that this judgment is not fair and just. They took all of her money over a month and a half, half a million dollars. Well, what about somebody who goes into a convent for the rest of their lives? A convent? Somebody who was persuaded by the teachings of the Catholic Church to give up, to make no money, not to speak for their lives for except one hour a day and take a vow of poverty and lived that for 50 years. Okay. And then that woman turned around and said, I made a big mistake, I wasted my life in a convent. I was deluded because you told me I was going to go to hell if I didn't do it. Okay. But here there's more than simply, first it's a Japanese judgment. Well, you would agree with me that that woman doesn't have a cause of action. In the United States. Well, she would depending upon more facts. She might have a cause of action if someone put a gun to her and said, thou shalt join a convent. No, but there were other facts that were not simply, you shall give us money or else you will go to hell. They first persuaded her to stop taking her medications. Precisely. To make her illness worse. I mean, that's what the Japanese court found. That's precisely right. The Japanese court said that what happened here was not based upon free will. They said that. They found that themselves. So in order for an American court to say that that's not happening, that that didn't happen, it has to specifically gainsay what the Japanese court did. In order to get rid of this judgment, an American court would have to say something like the following. The Japanese court didn't know what they were talking about, and not only that, they were lying about what they were really doing. That hardly comports with comedy. C-O-M-I-T-Y, not E-D-Y. That hardly comports with what you're supposed to. Although both are true. I was going to make that joke myself, but I refrained, given where I am. That's not a good audience for that joke. Yeah, exactly. Yeah, that's the point. In order for an American point to say that, it would have to tell the Japanese court that they're full of it. Not that they're both wrong under Japanese law, and that they're not telling the truth when they say they're not judging anything but conduct. And they said that explicitly. And we can tell that there are other facts besides the religious beliefs that they concern themselves with. Of course, they describe those religious beliefs as central to the description of the facts. You must know the background. But what they attacked wasn't the beliefs themselves. It was the pressure we're talking about. But ultimately, you don't have to prove that an American court would have done the same thing if this all happened in the United States. What you have to prove is that this was so far off from what an American court would have done if this had happened in the United States, that it was repugnant. So even if on these set of facts, which I still tend to believe, an American court would say, well, you know, telling her not to go to her father's funeral. I mean, there was no, as far as we can tell, they told her that, and she believed it. And they told her not to get a job. And nobody was lying to her. And nobody was taking anything from her. And nobody was hurting her. But on the other hand, there were some additional facts, as you say. So it's your basic argument that it has to be kind of off the wall in terms of an American judgment before it could not be. That is my basic point. It has to be more than off the wall. It has to be, the case is set, and I've cited a bunch of them, to say it has to be an outrageous departure, something that just offends what we think is just. And there's no way that happened here. And another, to underscore the similar, related point, is that this plaintiff, Ms. Ono, Naoko Ono, she was a member of this church for eight or ten years. And she was giving 10% of her money for years, and she was giving 10% of her money after that, giving these tithes. This lawsuit, the Japanese court wasn't, no one forced the church to give back those monies, those normal tithes. All they were concerned about was this outrageous portion over the month and a half that is at issue here. No one is attacking the church's policy of requiring tithings, etc. It's only this outrageous part. And it is outrageous. The question, whether or not, requiring someone with threats, who has the things we talked about, to give up 100% of their money. Threats were religious threats. But they're not only religious. They were only religious threats. What other threats were there? They told her they wouldn't let her be with her father. No, they wouldn't let her be. They advised her not to. That's not a threat. The Japanese court concluded, we don't know all the facts, we know what the Japanese court concluded. The Japanese court concluded they overcame her free will by those facts. They don't describe exactly how. Certainly in my hypothetical, about the two-day revival meeting, you could certainly say the same thing. Or about the woman who gave up her life to be a nun. Look, two points. I don't think it matters. It doesn't matter. I don't think it matters. You don't want to go down that road. I don't want to go down that. Look, I don't think it matters. I think if someone forced me down that road, I could still stand up all the way down the road. But I don't want to go there. Because it doesn't matter under the law, which says it has to be so outrageous, you have to tell the Japanese court that they didn't know what they were talking about. You can't do that here. No, you don't even have to do that. You don't even have to tell the Japanese court they didn't know what they were talking about. You have to say that what the Japanese court did, even if they didn't know what they were talking about, was so outrageous that we simply won't enforce it. Right. And there's another whole issue. I don't know if it matters anymore. Because I think that disposes of this case. It really does. But there's other issues that both sides talk about, about whether there's state action. And this is not the kind of state action that's at issue. The American court didn't condemn anyone's beliefs. And the American court didn't even do anything except do what it's bound to do under the treaty and the applicable law. Namely, thou shalt follow foreign judgments. No one disputes that there is a judgment. American courts are bound to recognize that judgment unless certain things are shown to be true. And they're not. Namely, the outrageous things that we all talked about. And I believe that under MacArthur and his lawyers, that we drafted the Japanese laws. Yeah, we did. That's why it's so ironic. That patterns ours. I haven't read it. Their court system is very, very similar to ours. That's correct. In fact, even in the appellant's brief, they talk about how the Japanese Constitution, and they correctly note, has all the same sorts of protections that we have. So in order for them to win, they have to tell the Japanese courts that they didn't follow their own Constitution. I mean, come on. That's not what... All right. Yeah. Okay. 56, 58 seconds. I have one other question. Okay. You said, I'm looking at the Maryland defamation case, and you said it rested on a particular provision of the Foreign Judgment Enforcement Act. I don't see that. They go into a long, long story about the constitutional issues, and I don't see that it rested. Maybe the Maryland statute didn't have such a thing, but they certainly don't suggest that it did. I'm sorry to be dense. I don't follow your question. I had asked you earlier whether, under your theory, the cases refusing to enforce English defamation judgments were right or wrong. Okay. And you said, well, that's based on a different provision of the Uniform Foreign Judgment Enforcement Act. Okay. I'm not seeing that in the opinion. Okay. Because there's a handful of opinions that deal with that. Some are that provision in the statute that talks about what you deal with recognition of foreign defamation judgments was added to the statute fairly recently. Right. So you didn't answer my question. Maybe I didn't. You threw me off because I didn't remember having seen that. Right. Now I follow why I threw you off. All right. Yeah. And what I was trying to get a handle on what this repugnancy concept is, and assuming that we're proceeding without any special provision, were those cases wrong, i.e., was that degree of diversions? Now I understand you. Okay. I'm sorry. That degree of diversions from our law, when you have cases between two private parties, you either do or don't have state action from the enforcement here of those judgments. Right. It's really a question of how far off does it have to be to be a repugnant. Right. So are those right or wrong cases? Here's my answer. In fact, I talk about it in my brief. I say it's hard to quibble with their conclusions because they were dealing with really kind of frontal assaults on the core principles of the First Amendment because what it was, it was defamation cases against the press. Okay. And that press and the actual facts in those cases, it was actually done here. Someone put a website and put something about French. There's a couple of cases. But the important fact is that it concerned activities that were done in the United States. And America obviously had a vested and strong interest. Well, here the speech, well, it's not entirely clear. I'm sorry. Just a minute. Right. So therefore, yeah, I mean, I don't know whether it was right or wrong in the end. I can see why they could say that so severely confounded First Amendment principles that it deprived the American public of news that it had. They weren't saying it. I mean, the whole, that whole line of cases. Yeah. And the United States must assume that there is some state action simply in the adjudication of these disputes because the disputes are between private people. So the core action has to be the state action. That is true. I follow your logic. Okay. And that must be true in the religion cases, too, because they're churches versus private people. And yet we say there's a First Amendment problem here. So your point is if there's state action for the duck, there has to be state action for the duck. I'm wondering. There's state action for one. I'm wondering. Yeah. I'm wondering why then the enforcement of a foreign judgment isn't as much state action. Okay. I think the short answer is that you go back to the repugnance question. And I never denied that you can't look at the Constitution, you can't look at American traditions in sort of informing your judgment as to whether or not a particular foreign judgment offends our sense of what is just and decent or not. Of course you can look to the Constitution. And in those cases, those press cases, those foreign judgments that were directed at activities done here really did amount to an attack and it really did amount to a muzzling of the press, which kind of encroached upon our First Amendment values. By extreme contrast, what we have here is not an encroachment upon our First Amendment values. What we have is a Japanese court that applied Japanese law to condemn stealing, to condemn overpowering people's free will, and to condemn taking her life savings over the course of two months. Those are hardly comparable. I could also say that those cases, there's that New York case, Sorrell, that relies upon a New York district case. The New York district court case says, well, they just made up this language about constitutionally mandatory. Well, that kind of sounds good. Oh, it relates to this First Amendment, it must be constitutionally mandatory. Well, that's just not true. I mean, I know it sounds good, but that's not what the statute says. The statute talks about certain kinds of considerations that make non-recognition mandatory, and other kinds that make it permissive. In this particular case, it clearly and flatly and undeniably falls into the permissive camp. There's no question of mandatoriness here. There's only a question of judging whether it's repugnant. And I submit to you again for the thousandth time, a judgment that says thou shalt not steal all of her money, half a million dollars over two months. Nobody's going to say that's repugnant to our sense of justice. Nobody could say that. Thank you. Thank you very much. Okay. Very brief. Just following up on the last issue about state action, we're within the scope of California law, and the California Supreme Court in Molko explicitly said, judicial sanctioning of tort recovery constitutes state action sufficient to invoke the same constitutional protections applicable to statutes and other legislative actions. And the reasoning for that would seem to be clear. When you impose a severe monetary sanction, whether it's on a press, a newspaper, a church, you are affecting their ability to exercise whatever that First Amendment right is. That's what's at issue here, and that's why it goes directly to public policy of this country, of the state of California, and why we contend that given the underlying facts as exhibited in the Japanese judgment, it is repugnant to that policy. Thank you. Thank you. The matter is submitted. We'll go to the next matter.
judges: Pregerson, Graber, Berzon